Good morning. Our first case for argument today is ADT, LLC v. NLRB. Appeal numbers Good morning, Your Honor. May it please the Court, my name is Matthew Kelly, and I represent ADT, LLC in this matter. There are three main issues before the Court that I'd like to discuss today. The first is whether or not the Board had substantial evidence that ADT unlawfully withdrew recognition from the bargaining unit at the Janesville, Wisconsin facility. The second issue stems from the first, in that did the Board have the power to alter the contract between the parties to create a brand new bargaining unit description. And finally, whether or not the unilateral changes made by the company were unlawful. The last issue is fairly simple and straightforward. I think both parties agree that all unilateral changes happened after the company withdrew recognition and after the end of the collective bargaining agreement between the parties. Therefore, if this Court finds that the company lawfully withdrew recognition, the unilateral changes were lawful. So, Mr. Kelly, the decertification petition that you relied upon in this case, was that signed by any member of the bargaining unit? No members of the Rockford location signed the petition. No members of the bargaining unit signed that, correct? Well, I would define the bargaining unit, the appropriate unit, as all members of the Janesville facility, Your Honor. You define it that way. I believe the law defines it that way, Your Honor. Well, indulge me for a minute. It's very clear that the Madison group was not represented by the union and the Rockford group was, correct? That had been the case for 30 years or so, right? Correct. And no member of the, who was represented by the union, asked or signed that decertification petition, did they? That is correct. All right. Can you point me to any precedent or any authority for an employer to give any weight to a decertification petition not signed by anybody represented by the union? Your Honor, I cannot provide any precedent, but I would say that the law is fairly clear that when bargaining units are combined, if the bargaining unit… And no bargaining units were combined here. We had unrepresented folks and represented folks, correct? That's correct, Your Honor. Okay. So, let me ask again. Any legal authority for giving any respect to a decertification petition not signed by any member of the bargaining unit? Board law recognizes that units where non-represented employees are combined with represented employees can create an integrated unit where the company can withdraw recognition. Unilaterally? Yes, Your Honor. What authority is that? What's the best authority to justify this extraordinary self-help? Your Honor, I wouldn't characterize it as extraordinary. I would. Bargaining units are combined all the time. I would. I've asked you for precedent. You haven't provided any. I do not have any. If you could be specific? I cannot. Thank you. Go ahead. The first two issues create practical and legal problems for the bargaining unit going forward. The board has redefined the bargaining unit in such a way that no one will ever know for sure whether or not future employees are in this bargaining unit or not. How so? Because the way at least I read it, the bargaining unit is described as those who regularly work in Rockford. And the way I kind of see this is you've got one group of employees that are in Madison that service the Madison area, one group that are in Rockford that service the Rockford area. ADT makes a business decision to open an office in Janesville, which is between the two. And it seems to me that the Rockford employees regularly work in the Rockford area and the Madison employees regularly work in the Madison area. And it seems to me that, you know, there certainly may be employees from Madison who have to go down to Rockford. I suspect that happens in every line of work, and I can see how that happens in ADT's business. And the same with folks from Rockford going up to Madison. But how do you now have folks in Madison regularly going to Green Bay and regularly going to Chicago? I mean, I don't understand how you can't figure that out. Absolutely, Your Honor. So the concern is the bargaining unit is redefined as employees in the Janesville facility who regularly work in the Rockford service area. There are a couple of problems with that. One, I'm not sure I understand what regularly is. And two, there is no defined service area. There has never been a defined service area. The parties contracted for employees to be represented who worked at the 510 Lafayette Avenue facility in Rockford, Illinois. That facility ceased to exist. That is the sum total of the negotiations between the parties over any geographic limit. Mr. Kelly, is there any evidence that those employees who worked at the Rockford facility, that their job has changed at all since they went to Janesville? Other than reporting to Janesville, meeting in Janesville, working and meeting, going to training meetings and sales meetings with the Janesville employees, including the non-represented employees. That's very limited. Those meetings, I think there was one breakfast meeting where they were all there together. But the question is, is there any evidence, other than they go to Janesville to pick up their parts, as opposed to the Rockford facility, when they are carrying out their duties, is there any evidence that their duties have changed at all from when they were headquartered at Rockford? The employees do the same work using the same equipment. In the same area. In the same area, which is not defined as just Rockford, Your Honor. If I could rephrase Judge St. Eve's question, though. There was conflicting evidence, as I understand this record. And the question is, is there evidence indicating that nothing substantial changed, in addition to all of the assurances that are in the testimony to the union and to the Rockford employees that nothing was going to change? The changes are geographic in that where the employees report to work and who they interact with on a regular basis. But they don't report to work there. They work out of their home station. At least that's what the evidence looked like to me. They have to go pick up parts at most once a week. But they don't report there. Or they don't physically report there. In a pre-COVID environment, the employees would regularly report there for work meetings. They would report there for disciplinary meetings. They would report there if they wanted to talk to their supervisor. And they'd go to get parts once a week, which is 20% of their work week. Now, to bring it back to Your Honor's question, the concern is we hire ADT technicians. And if you are an ADT technician who lives in Rockford today, a computer tells you where to go, based primarily on where you live because we have efficiencies in gas. We have efficiencies in overtime and wear and tear on our trucks. You are in the bargaining unit. You retire tomorrow. Congratulations to you. You're retired. I hire someone to replace you who lives in Janesville because no one who lives near Rockford applies for the job. Once they do that, the computer is going to give them, I don't know, 25% of your old work and give them 75% of other people's work. Are they in the bargaining unit? The board's process is if I replace you, I'm in the bargaining unit. But the bargaining unit is defined as those who regularly do work within the Rockford service area. I can't define for you, and neither can the board, what the Rockford service area is because the parties have never done so. Because the evidence supports that employees from Rockford would go to Wisconsin. Employees from Wisconsin would come to Rockford. Employees from Chicago would come to Rockford. That all sounds like a solvable problem in negotiations, right? But there were no negotiations here because, at least as I understand it, ADT told the union nothing's going to change, right? Your Honor, it could be a solvable problem in negotiations, but the scope of a unit is a permissive subject of bargaining. The union is not required to negotiate with us over this newly created bargaining unit. Furthermore, it creates jurisdictional issues. Have you tried? But they're not required to. Have you tried? Have you asked? Instead, you went with this self-help a la Kalamazoo. I would have thought you would have learned the lesson then about self-help with these sorts of arrangements. The Kalamazoo case is very different, Your Honor. Just in terms of how precisely the geographic area was set up? In that the company and the union had a bargaining history and understanding of what the geographic was, and they had contractually discussed it. Wouldn't it be to the union's benefit to negotiate this with you? To negotiate what happens to new employees who come in? Well, no, because the board has created a bargaining unit where every new employee, according to the board, who replaces any of you who retire will automatically be in the unit. Well, they did that after this extraordinary self-help that ADT engaged in, the unilateral changes. I don't know why you're complaining or seem shocked that the board has taken steps to protect the union's and employees' interests in that situation. But the board has contractually obligated the company to future obligations that they never agreed to and couldn't have been forced to agree to in bargaining because of the permissive nature of the issues. So if somebody says, I want to talk about the scope of the unit, Your Honor, I can just say no, and I can't be forced to. It's not a mandatory subject of bargaining. Well, if we were riding on a clean slate, that might carry a little more weight, but that's not the situation we're seeing here, so okay. Okay. In the question about the coercion of Mr. Anderson, you pointed out that Mr. Sissom, I think, who was also present at that conversation, did not testify about it. Is that right? I believe so, Your Honor. He did testify at the hearing, correct? He did. And you had the opportunity to question him? The company did, Your Honor. And did not on this subject, did it? I don't recall, Your Honor, I didn't question the company. Okay. Furthermore, Your Honor, if I can indulge in one other hypothetical. Because of the way the unit has been described, if ADT loses business in the Rockford area to a competitor, I'm not going to want to lay off my techniques. I'm going to want to assign you regularly to work that is outside the Rockford area because I no longer have business in Rockford. But you can travel. Perhaps you moved, you live someplace where it would be useful. Are you in my bargaining unit or not if you are now regularly performing work that is outside of the Rockford area, which no party here has ever defined? If ADT Chicago, another unionized facility, comes to Rockford to do work, now based on this unit description, do the teamsters in Rockford have a 10K NLRB jurisdictional dispute over bargaining unit work being done by non-bargaining unit union members from outside the area? None of those things were negotiated, nor were they ever considered because the parties have never had a jurisdictional area. ADT has always assigned employees to work wherever the work was. And now ADT may or may not have to assign Rockford employees to do work within a Rockford service area that no one has defined. Mr. Kelly, can I ask you a question? If I recall correctly, Judge Peterson granted a 10J injunction in this case. Is that right? That is correct. What is the status quo? Where are we right now in terms of negotiations, representation, bargaining, et cetera? I'm not sure, Your Honor, whether or not the status quo, the 10J injunction, ended when the board's decision came out and the board required that the union could, if they chose, ask the company to rescind whatever unilateral changes they wanted to or they didn't have to. Okay, so I've never seen this end of a 10J injunction before. I granted a couple as a district judge but wasn't around for the later chapters. But the 10J injunction ordered continued recognition of the union, right? And I believe that no further unilateral changes would occur during the pendency of the claim. And presumably ADT complied with that injunction? Correct. And since the board's order? Since the board order, I'm not sure whether or not the union and ADT are involved. I'll ask the board. Thanks. Okay. Finally, Your Honor, I'd like to note that the evidence does support that the Janesville employees became an integrated unit sometime between January and May of 2020. When the Janesville employees who were formerly in Madison came to the new facility, they began working together, having the same supervisor in the same location. And, Your Honor, I would respectfully disagree that their work… Didn't they always have the same supervisor? I'm sorry? Didn't they always have the same supervisor? They had the same supervisor who was based in the Rockford facility, yes. But when they merged at Janesville, they had the same…both had the same supervisor that they had before. There wasn't a change in supervisor. No, there wasn't. But they did have several, many, more than 10 meetings either via Zoom or in person after the pandemic began where only Janesville employees were invited, including the former Madison and the former Rockford. The company has been treating them as an integrated unit, which is the reason it relied upon the decertification petition by the employees. So, why did they tell them that nothing was going to change? It told them that nothing was going to change, Your Honor. Nothing did change until the decertification petition. The supervisor said, you're going to go down to…because you're going to continue to do the same work. Yeah. The fact that they're doing the same work… I'm trying to imagine, Mr. Kelly, the union, after being told nothing is going to change, coming to ADT management and saying, we'd like to bargain over the effects of this change in the location of the facility. And if that request had been made, I assume the answer would have been, there's nothing to bargain about because nothing's going to change. That's what we've told you. Well, I think the company's response would have been, we will absolutely bargain with you over the effects to the extent that there are any. But there were no changes in the working conditions of the employees when they moved to Janesville. That is separate and distinct from the 11 employees in Janesville, a majority of whom signed a petition saying, I don't want to be in this union, changing the circumstances. I reserve the rest of my time for rebuttal, Your Honor, but I'll answer any final questions you have. Thank you, Mr. Kelly. Next, for the Board, we'll hear from Mr. Heller. Good morning, Your Honors. May it please the Court, Joel Heller for the National Labor Relations Board. Substantial evidence supports the Board's finding that ADT unlawfully withdrew recognition from Local 364 after a decades-long collective bargaining relationship. An established law is that existing bargaining units remain presumptively appropriate even following a move or a merger. ADT failed to meet its... This Court has not adopted that presumption. Does it matter if we apply the presumption or not here? So this Court has never been faced with a case. They haven't decided one way or the other on this issue. Though the Court has noted in the Joby Foods case that history of bargaining is particularly appropriate and informative information. And it's entitled to substantial deference, which is why I ask, does it matter if it's entitled to substantial deference versus adopting a presumption? I suppose not. I mean, I don't think that... I don't think ADT has challenged the... as a legal matter that there is this presumption. I mean, it's pretty standard in board law. I think they may have. That's what I'm thinking. For merger cases, I think they do challenge that, but... Well, I think it's no different in a merger case versus a successor case. I mean, the question in both cases... That might be true, but your statement that they haven't challenged it, I think, might be overstating it. I will step back. But I think... Yes, it's certainly... No court has rejected the idea that there's this presumption of appropriateness. Does the Court absolutely have to say that in this opinion to find for the board? I guess not. But... So ADT has not met its heavy burden to rebut that presumption or even just to come forward with evidence to counteract the substantial deference that is owed to that... of collective bargaining. Its arguments on appeal consist primarily of challenges to the board's factual findings, but its claims are not supported by the record and are contrary to the credited evidence. The record... ADT, though, is also raising, in essence, practical problems going forward here. You heard Mr. Kelly's hypotheticals about the retirement or the change in business levels at Rockford leading to Rockford area employees working elsewhere. Do you have a response? Sure. I mean, just one big picture response and then a more specific one. The big picture is there's... It's always the case that there might be future changes or differences that might arise in the future. But the question is whether the board's decision is supported by substantial evidence on the record before it, so in this case. But as far as going forward, the bargaining units are described, and this one is described, in terms of worker classifications, not individuals. So it's not that they're saying the bargaining unit consists of Frank. Frank retires and then they hire Jane to do Frank's work. It's not that Jane is necessarily in the unit. It's that the unit is composed of employees who regularly work in the Rockford Service Territory. And as a factual matter, there is a traditional Rockford Service Territory. That's what multiple credited witnesses said. They do the majority... The Rockford employees do the majority of their work in Northern Illinois within 20 miles of Rockford. So is that... Regularly means majority of your work in Rockford area means within 20 miles of Rockford? The... Right. I mean, it is not specifically defined as that, but I think... So how would ADT figure that out? Right. You look at the record evidence before the court or before the board in this case, and it shows that that's what the Rockford Service Area is because that's where the Rockford employees have worked. The Madison Service Area is where the Madison employees have worked. And so the testimony is that they spent the majority of their time there. They go to Wisconsin occasionally as needed basis on a rare occasion, not often. These are all quotes from the record. So the union would agree that majority equals regularly. In other words, if our opinion changes it to say instead of regularly works in the Rockford area, if we write the majority of their time is spent in the Rockford area, you'd have no problem with that. Well, I would... I would... I think that the... We would request that the court enforce the board's order as written. I mean, I think when you look at... But what's the difference? You just... I thought you just told me there's no difference. So I guess that we just didn't... We didn't frame it numerically in the same way. I think as a practical matter, that regular and majority... Well, I guess I wouldn't say majority of their time necessarily. You see, that's the problem here with this. What Mr. Kelly raises, the one point that he thought was a good point that he raised, he said if an employee spends 25% of their time in the Rockford Service Area... I agree with you, by the way. Rockford Service Area is defined in the evidence, right? That would be... You can look at the record and say this is what Rockford Service Area means. That's not an issue, to me at least. But regularly, what if they spent 10% of their time in Rockford or 5% of their time in Rockford? Certainly, someone would not regularly spend time in Rockford if they were sent there as a one-off, right? You have a service technician in Chicago who has to go help with a job in Rockford. You couldn't say that that person regularly spent time in Rockford. But if you have a Rockford employee who, let's say, is on maternity leave and so you send someone from Madison down to cover for that employee for two weeks or two months or three months or six months, are they regularly in the Rockford area and now part of the bargaining unit? Who knows? Right. I guess I would say that it's not just a question of number, like majority of their time, because it's also that they would say – it's that it's, I guess, random when they would go to – when the Rockford employees would go to Wisconsin or the other way around. There's no – it's sometimes. I see. It's not often. Yeah, it's like a one-off or an as-needed basis. Yeah, random as opposed to regular would be on a regular sort of biweekly basis, let's say. Predictably, right. Yeah, something like that, as opposed to say, well, they spent 30% of their time here, 70% of their time. So is it the board's position that if someone who is regularly covering the Rockford area retires and ADT hires somebody else, but their needs for that new person turn out that there's more need in Wisconsin? What happens with that person? I think if that person is working in the Wisconsin area either as a majority of their time or as regularly or not kind of on a random or one-off basis, then they would not be in the bargaining unit. Even if they technically replace somebody who was in the bargaining unit who retired? Well, if this is a case that comes before the board, we're going to look at various things, so I don't want to say 100% one way or the other. But yes, because the question – because the bargaining unit is defined in terms of job classifications, not in terms of individuals. How do you respond to Mr. Kelly's argument that the union doesn't have any incentive to sit at the table and bargain over describing the unit? That the union wasn't given an opportunity to do that because ADT – But going forward, he has argued that the union has no incentive now that it's been defined by the board to sit at the table and try to negotiate. Well, I think if the – I think given the – I think we just don't know that. I think we're going to have to see in bargaining. I mean if the union refuses to bargain about something, that itself could be an unfair labor practice. So I think their incentive to bargain in good faith is because they are legally required to do so. One other point about the regular language in the bargaining unit description is that this is coming out as a remedial matter. The board's order says – describes the unit as part of its remedial order of what ADT is required to do. And the board's remedial choices are reviewed for abuse of discretion. So even Judge Kersh, if you might say, well, I would rather they've used a different word here. The standard of review is abuse of discretion. Did they abuse the discretion by saying regular rather than majority of the time? Yeah, but maybe the record can be used to adequately define regular. I think so as well. As the way the board used it in its order. I think so as well. I was just following up with one more point there. Yes, and so Judge St. Ives, you were asking the Rockford employees. Their jobs have remained exactly the same following – or almost exactly the same following the change. They're doing the same work, the same terms and conditions until ADT changed them. Yes, they're reporting to the Janesville office once a week to pick up supplies. So the physical location of the office is really the only thing that changed. And that's what ADT told the employees and the union was going to be the case before the move, and that was borne out by practice. ADT in advance told the union that essentially it's going to be two separate offices. There will be a Madison side and a Rockford side. That's how employees continue to describe their work. There's a testimony at JA 145 where a Rockford employee is asked about a different employee, and he says, oh, he's on the Madison side of the office. Question, and you know that because what? Answer, that's the area he handles. And it didn't seem like ADT disputed that that representation had been made before the Janesville office was opened. Correct, they did not. And like I said, it was borne out by the facts after the move, those representations were. Yes, and as we've discussed before, the service area is defined by practice, even if it's not defined in the contract the way that was the case in the Kalamazoo case. But other than that distinction, this case and the Kalamazoo case are pretty much job for job the same. The same employee are doing the same thing, getting called out by the board in the Sixth Circuit there. The same thing should happen here. Mr. Heller, could you answer my question about the status quo at this point? Sure, so after the 10-J order by the district court, the ADT was under an obligation to re-recognize the union. I don't know if that happened. There were no contempt proceedings after the injunction. I don't know if there just wasn't time. I'm not sure, but Mr. Kelly is correct that the 10-J injunction has now expired after the board's decision issued in this case. But the board's decision doesn't take effect unless and until it's enforced, right? That's correct. So there's kind of this weird, the district court issues an injunction which then lapses until the Court of Appeals enforces the board order. That's true. I mean, certainly ADT can voluntarily comply with the board's order, which hasn't happened to me here. Can I ask you also, let's indulge in an assumption that everybody's working in good faith, and the merger of those two locations does pose some new practical challenges going forward with the kinds of hypotheticals that ADT has raised. You suggest in your brief that there is a process for resolving such disputes that does not involve unilateral self-help. I'm not familiar with it. Could you tell us what it is? Yes, and I had actually just written that down to say. So there is a process by which an employer or, I suppose, a union can petition the board for what is called a unit clarification. It's a unit clarification petition. And they can essentially ask the board to opine on whether there has been a change in the unit based on changed circumstances. ADT could have done that at the expiration of the contract here, but they didn't. They acted unilaterally in withdrawn recognition. And so it's possible if there are further changes in the future, practical changes, that that is an avenue that ADT could take in the future. They could file one of these, what's called a UC unit clarification petition. There's also, of course, the opportunity for bargaining between the parties about any changes. Right, the ADT could not unilaterally say we're changing all the – everyone's going to come to Madison now, so there's not going to be a unit anymore. They would have to bargain over changes to the scope of the – or taking bargaining work out of the bargaining unit. So there's two avenues there. There's bargaining between the parties, and then there's this UC petition with the board that we can deal with future changes through either of those avenues without the kind of disruptive self-help that ADT took here. Because after all, zooming way out, one of the stated purposes of the NLRA is stable labor relationships. That's why we have this kind of presumption in favor of existing bargaining units. There was a 26-year bargaining relationship between the parties, and the withdrawal of recognition disrupted that relationship in a way that is contrary to the overarching policies of the National Labor Relations Act. Mr. Heller, are you aware of any authority, legal authority of any kind, for giving way to a decertification petition not signed by any member of the bargaining unit? No, none at all. That's not how it works. Judge Hamilton, right, you can't decertify someone else's union. So there's no weight that should be given to the signatures from non-unit employees in this case. One other response to your question, Judge Hamilton, to the other side is that regarding Mr. Sissom, he was called as a witness. The employer, ADT, had an opportunity to question him about this, about the threat to Mr. Anderson, but they did not do so. There were no questions asked of him about this conversation, so nothing he said called into question Mr. Anderson's testimony. I was surprised that neither side asked about that. Who knows? Who knows what was going on at the time, but I was not there, nor was Mr. Kelly, as far as I know. But I think the testimony of Mr. Anderson stands undisputed. I mean, they didn't call anyone, they didn't call Mr. Ides, they didn't cross-examine Mr. Sissom about that. So as far as credibility, I believe that's an easy call. There certainly are no extraordinary circumstances, which is the standard to overturn the Board's credibility determination, regarding the threats and interrogation, or frankly, regarding any of the credibility determinations that underlie some of the Board's findings about the scope of the geographic distribution of the work, the fact that none of this changed following the move, where they're continuing to work in the same areas as they did before the move. So I believe that is all I have, unless the Court has further questions. I will ask that you enforce the Board's order. Thank you, Mr. Heller. Thank you. Mr. Kelly, rebuttal? Thank you, Your Honor. Your Honors, I'd like to point out that the legal standard that the Board uses when combining units like this is whether or not the bargaining unit maintains its distinct integrity. The Kalamazoo case and the Comer case are both instances where the Board found that the bargaining units, when moved into larger groups of non-represented employees, maintained their distinct integrity in various ways. In Comer, the employees had specific skills. They could operate machinery that no one else in the facility could operate, and that machinery was moved from their prior facility to the new facility where they did the work. The bargaining unit that the Board created specified that the employees in that bargaining unit were employees who did the work that had been done at the previous facility, easily recognizable, easily understandable for the future. In Kalamazoo, the bargaining unit employees have a contract that has a service territory, and in that contract, the union required the company to notify it of other employees who were coming to work in their service territory. They had bargained for a geographic exclusive claim to the Kalamazoo area. That has not occurred here. Those are the only two instances where this particular type of thing, where a smaller group brought into a larger group, and the Board takes it upon itself to redefine the union. The company's position is that when the Madison employees were integrated into Janesville, they created the only appropriate bargaining unit. Otherwise, there is a fractured unit of four employees who do exactly the same thing, in the same trucks, with the same equipment, in the same geographic area as the other Janesville employees. Finally, the issue of whether or not the employees were integrated was hampered by COVID in one respect. Employees no longer went to the office for any reason after April of 2020. From a timing perspective, these employees who were integrated, who did attend meetings, who were asked to work with those employees, were no longer asked to do so because of the pandemic. And the Board has utilized that fact to show that they weren't really interacting at all, whereas the record testimony specifies that the Rockford employees who did testify stated that they saw the former Madison employees more often than they saw their Rockford employees when they were just in the Rockford facility. Thank you, Your Honor. Thank you, Mr. Kelly. Thanks to both counsel. The case is taken under advisement.